**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**DANIEL TOCCI** | **Docket No. 24-CR-30061-MGM** |

**DEFENDANT'S MOTION TO DISMISS INFORMATION,**
**OR IN THE ALTERNATIVE, TO SUPPRESS EVIDENCE**
**AND MEMORANDUM IN SUPPORT**

Defendant Daniel Tocci respectfully moves this Court to dismiss the information charging him with one count of possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2). Dkt. # 1.

Mr. Tocci was charged in the District of Columbia with committing alleged crimes at the United States Capitol on January 6, 2021. The government executed a search warrant at his home, in an effort to secure evidence related to January 6 offenses and based on probable cause solely of those alleged crimes. That search led to the prosecution of this case. On January 20, 2025, President Donald Trump signed an Executive Order "direct[ing] the Attorney General to pursue dismissal with prejudice to the government of all pending indictments against individuals for their conduct related to the events at or near the United States Capitol on January 6, 2021." The following day, Mr. Tocci's case in the District of Columbia was dismissed with prejudice upon the government's motion.

Unlike many other derivative prosecutions where the government has sought to dismiss its charges, the government here has taken the position to continue prosecuting Mr. Tocci, seemingly because of the nature of the evidence that was discovered under the unlawful search warrant. But

1

like those other derivative cases, the evidence in this case was improperly obtained, through the "injustice" of the January 6 investigation as recognized by the President. In other words, under the Executive Order, the January 6 cases were invalid from the onset, so the warrant in Mr. Tocci's case should never have issued, and the evidence underlying this case should never have been seized. But for this injustice, the instant charge would never have occurred. The results-orientated approach advocated by the government does not comport with the rule of law. Mr. Tocci moves to dismiss the charge against him, or in the alternative, to suppress the evidence seized pursuant to the unlawful warrant in the pardoned case.

## I.    FACTS

### A.  January 6 Warrant Affidavit and Execution

On November 28, 2023, FBI Special Agent Derek Boucher applied for three separate search warrants based on the same affidavit. *See* Affidavit in Support of an Application Under Rule 41 for a Warrant to Search and Seize, FBI Special Agent Derek Boucher, Nov. 28, 2023, attached as "Exhibit A." The agent sought warrants for Mr. Tocci's apartment, his cell phone, and his person. *Id.* at ¶1. In each application, Agent Boucher stated that the searches would be related to the alleged:

> Destruction of government property; entering or remaining in restricted buildings or grounds; disorderly and disruptive conduct in a restricted building or grounds; disorderly or disruptive conduct in the Capitol Buildings; parading, demonstrating, or picketing in a Capitol Building

*See* Applications for Warrants by Telephone or Other Reliable Electronic Means, FBI Special Agent Derek Boucher, Nov. 28, 2023, attached as "Exhibit B" at 1-3. These acts were alleged violations of 18 U.S.C. §§ 1361; 1752(a)(1); 1752(a)(2); 40 U.S.C. §§ 5104(e)(2)(D); and 5104(e)(2)(G). *Id.*

Agent Boucher's affidavit in support of his applications for these warrants stated that on April 18, 2023, more than two years after the events of January 6, a Hadley police officer identified Mr. Tocci from video footage taken in and around the U.S. Capitol that day. Exhibit A at ¶38. The officer allegedly recognized Mr. Tocci from a traffic stop the officer conducted on January 24, 2023. *Id.*

Agent Boucher alleged that according to the U.S. Capitol's CCTV, Mr. Tocci entered the restricted Capitol grounds at approximately 2:25 PM. *Id.* at ¶41. The warrant affidavit included a photograph of Mr. Tocci allegedly entering the Capitol building through the Senate Wing Door at approximately 3:18 PM. *Id.* at ¶43. He was allegedly in the building "between approximately 3:18 p.m. EST and almost 3:22 p.m. EST," i.e., four minutes, when he exited the Capitol through a window. *Id.* at ¶44. According to the agent, "[f]or the majority of the time, approximately 4 minutes, that Tocci was inside the U.S. Capitol building, he stayed near the door he entered through next to the wall." *Id.*

Agent Boucher alleged that according to the photographs, Mr. Tocci was using a phone to take pictures or video of the events. *Id.* at ¶46.

After leaving the building, at approximately 3:59 PM, Mr. Tocci allegedly approached the building from the west side of the Senate Wing Door "reached into a broken window, and broke off and removed a shutter slat hanging from the window []." *Id.* at ¶48. In total, the agent alleged that Mr. Tocci was within the Capitol's restricted grounds for 90 minutes. *Id.* at ¶50.

Agent Boucher alleged that Mr. Tocci was wearing the same jacket on January 6 as the day he was pulled over for a traffic stop, and that he likely still had the coat in his possession, which could be considered identification evidence. *Id.* at ¶51. He stated that "the portion of the shutter TOCCI appears to take, may hold sentimental value and be kept as a trophy or souvenir of sorts"

3

and still be in his possession. *Id.* at ¶53.

He also alleged that the government had identified Mr. Tocci's cell phone number, Facebook account, the type of cell phone he used, and his cell phone provider through its investigation. *Id.* at ¶52. The agent stated that the government's investigation of other January 6 cases led it to believe that many individuals retained possession of photos and videos, and the digital devices that stored them. *Id.* at ¶54-56. Agent Boucher further stated that those participating in the events of that day used digital devices to communicate and plan their attendance, as well as to post on social media afterwards. *Id.* at ¶57. He attested that "virtually all adults in the United States use mobile digital devices" and "it is common for individuals to back up or preserve copies of digital media (such as photos and videos) across multiple devices to prevent loss." *Id.* at ¶¶58-59. The agent alleged that therefore, there was "reason to believe that evidence of the offense that originally resided on the Subject's cell phone may also be saved to other digital devices within the PREMISES or on the Subject." *Id.* at ¶59.

The affiant stated the reasons why the subject premises was believed to be Mr. Tocci's home. *Id.* at ¶¶60-61.

He also stated that the property to be searched included "laptop computers, mobile devices, and/or tablets . . . hereinafter the 'Devices.'" *Id.* at ¶62. Investigators allegedly had reason to believe Mr. Tocci had "Devices beyond just a mobile phone." *Id.* According to a 2019 police report, three laptops associated with Mr. Tocci were searched as part of a separate investigation. *Id.* In addition, the agent attested, "laptop ownership among White adults is very high," and "individuals typically keep laptops, mobile phones and tablets at their residence." *Id.*

Agent Boucher sought permission to search for evidence in Mr. Tocci's home, on his phone, or on his person "in whatever form they are found," one form being "data stored on one or

4

more digital devices." *Id.* at ¶64. He also sought permission to locate "forensic electronic evidence or information that establishes how the digital devices were used, the purpose of their use, who used them (or did not), and when." *Id.* at ¶65.

The agent stated he anticipated that data analysis on any digital device "may take weeks or months to complete," so law enforcement would transport the items to a laboratory for review, instead of searching them on the premises. He also stated that the warrant would permit agents to "obtain from the person of TOCCI . . . the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Devices[.]" *Id.* at ¶¶66, 68.

Magistrate Judge Katherine A. Robertson issued the warrants as requested on November 28, 2023. The search was executed the following day. From Mr. Tocci's home, agents seized a laptop with charger, two cell phones, a tablet, thumb drives and hard drives, as well as non-electronic items. Receipt for Property Received / Returned / Released / Seized, FBI, Nov. 29, 2023, attached as "Exhibit C."

About six weeks after seizing these items, the FBI applied for another search warrant to search Mr. Tocci's electronic devices. The affidavit in support of that warrant application, submitted by FBI Special Agent Mary Micayla Davidson on January 18, 2024, describes the search of Mr. Tocci's home. It states that on November 29, 2023, FBI investigators entered Mr. Tocci's residence and located him in his bedroom, sitting on the edge of the bed. His laptop was closed and plugged into a charger. It was also located at the edge of Mr. Tocci's bed.

The warrant affidavit states that the FBI reviewed the contents of the laptop. During that review, investigators allegedly found multiple photos of child pornography. The FBI then allegedly stopped the search and submitted Mr. Tocci's devices to the Boston Regional Computer

Forensic Laboratory, where they were forensically processed. The content of those devices allegedly was not reviewed; however, the file names of a thumb drive and dock were apparently visible during processing. Those file names suggested child pornography.

Magistrate Judge Robertson issued the warrant to search Mr. Tocci's devices on January 18, 2024. The warrant was executed and agents seized child pornography evidence that serves as the basis for the charge against Mr. Tocci in this Court.

### B. Procedural history

On December 14, 2023, Mr. Tocci was charged by information, and on March 27, 2024 by a superseding indictment, in the United States District Court for the District of Columbia with: (1) destruction of government property, in violation of 18 U.S.C. § 1361; (2) entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); (3) disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); (4) disorderly conduct in a Capitol building or grounds, in violation of 40 U.S.C. § 5104(e)(2)(D); and (5) parading, demonstrating, or picking in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G). *See United States v. Tocci*, No. 23-CR-00439-JMC (D.D.C. March 27, 2024), dkt. #19. Trial was scheduled to begin on March 3, 2025.

On November 15, 2024, Mr. Tocci was charged in this Court with possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2). *See* dkt. #1.

On January 20, 2025, the day President Trump was inaugurated, he issued an Executive Order pardoning all January 6 participants as one of his first acts in office. Granting Pardons and Commutation of Sentences for Certain Offenses Relating to the Events at or Near the United States Capitol on January 6, 2021, President Donald Trump, Jan. 20, 2025, attached as "Exhibit D." The order proclaims to "end[] a national injustice that has been perpetrated upon the American people

6

over the last four years" and "begin[] a process of national reconciliation." *Id*. It lists 14 individuals whose sentences would be commuted to time served. All others convicted were granted a "full, complete and unconditional pardon." *Id*. The order states that the "Attorney General shall administer and effectuate the immediate issuance of certificates of pardon . . . and shall ensure that all individuals . . . who are currently held in prison are released immediately." *Id*. It further directed the "Attorney General to pursue dismissal with prejudice to the government of all pending indictments against individuals for their conduct related to the events at or near the United States Capitol on January 6, 2021." *Id*.

On January 21, 2025, the government moved to dismiss the January 6 indictment against Mr. Tocci with prejudice, citing President Trump's Executive Order. *See Tocci*, No. 23-CR-00439-JMC (D.D.C. Jan. 21, 2025), dkt. #33. The court granted that motion, and the case was dismissed. *See id*. (Jan. 21, 2025 order dismissing all counts).

Mr. Tocci now moves to dismiss the charge against him in this Court because all the evidence stems from the pardoned January 6 case.

## II.    LEGAL STANDARDS

The Constitution bestows upon the President the "Power to grant Reprieves and Pardons for Offences against the United States, except in Cases of Impeachment." U.S. Const. art. II, § 2, cl. 2. "To the executive alone is intrusted the power of pardon; and it is granted without limit." *United States v. Klein*, 80 U.S. 128, 147 (1871).

The President's pardon power is expansive. The Supreme Court has recognized that a Presidential pardon completely exonerates a person as if the pardoned conviction was never prosecuted in the first place:

> Such being the case, the inquiry arises as to the effect and operation
> of a pardon, and on this point all the authorities concur. A pardon

> reaches both the punishment prescribed for the offence and the guilt of the offender; and when the pardon is full, it releases the punishment and blots out of existence the guilt, so that *in the eye of the law the offender is as innocent as if he had never committed the offence*. If granted before conviction, it prevents any of the penalties and disabilities consequent upon conviction from attaching; if granted after conviction, it removes the penalties and disabilities, and restores him to all his civil rights; it makes him, as it were, a new man, and gives him a new credit and capacity.

*Ex parte Garland*, 71 U.S. 333, 380-81 (1866) (emphasis added). The Supreme Court stated in *Schick v. Reed*, 419 U.S. 256 (1974) that "[t]he plain purpose of the broad power conferred by s 2, cl. 1, was to allow plenary authority in the President to 'forgive' the convicted person in part or entirely[.]" *Reed*, 419 U.S. at 266. It continued, "We therefore hold that the pardoning power is an enumerated power of the Constitution and that its limitations, if any, must be found in the Constitution itself." *Id.* at 267.

## III.   ARGUMENT

The case against Mr. Tocci must be dismissed because the entirety of the evidence stems from a warrant that, according to President Trump, should never have issued. In the President's words, the investigation was "a national injustice" that was "perpetrated" for "the last four years," and requires a "national reconciliation." Exhibit D. As a result, the President issued Mr. Tocci a "full, complete and unconditional pardon." *Id.* President Trump ordered "dismissal with prejudice to the government of all pending indictments against individuals for their conduct *related to* the events at or near the United States Capitol on January 6, 2021." *Id.* (emphasis added). There is no question that the instant case is "related to" the events of January 6; the warrant affidavit is exclusively focused on allegations about Mr. Tocci's involvement in those events. There is no allegation or suggestion that Mr. Tocci was being investigated for any other crime, and more specifically – no evidence or allegation that he was being investigated for the crime of possession

8

of child pornography. Because the warrant and instant indictment are "related to" the events of January 6, the case must be dismissed. Prosecuting this case would violate principles of due process and equal administration of the law. In the alternative, the Court should suppress the evidence that the government seized by means of that warrant because it was an unreasonable search.

**A. This case must be dismissed under the Executive Order pardoning Mr. Tocci because it is "related to" the events of January 6, 2021.**

Dismissal with prejudice is required under President Trump's Executive Order because this case is "related to" the events at the Capitol, and therefore falls under the "full, complete and unconditional pardon." *Id.*

Agent Boucher's entire warrant affidavit, underlying the three initial warrants, and leading to the January 18, 2024 warrant for the electronic devices, was comprised of Mr. Tocci's alleged actions on January 6. *See* Exhibit A. The affidavit laid out what Mr. Tocci allegedly did at the Capitol, tied what he was wearing and what he allegedly took from the Capitol to his home, and noted that he was using his phone that day and may possess other electronic devices. *Id.* There is no allegation in the warrant that Mr. Tocci was alleged to have committed any other crime besides those at the Capitol. *See* Exhibit B. There is no hint that he was being investigated for any other reason. *See* Exhibit A.

But for the original warrants based on alleged probable cause of crimes related to January 6, the agents would never have had access to Mr. Tocci's home and would never have seen his laptop or encountered any data it held. Therefore, the search of his devices was "related to" the events of January 6.

President Trump noted in his Executive Order that the January 6 investigations were a "national injustice that has been perpetrated upon the American people *over the last four years*."

Exhibit D (emphasis added). The warrant affidavit states that the government identified Mr. Tocci from its January 6 investigation on April 18, 2023. Exhibit A at ¶38. The warrant was executed at Mr. Tocci's home on November 29, 2023. The second warrant for a full search of his laptop and devices was executed after January 18, 2024. President Trump recognized the ongoing nature of the injustice against Mr. Tocci, as the investigation took place over the course of four years, and the instant case is still being prosecuted. The Executive Order applies to this case.

The Department of Justice has agreed to dismiss many derivative cases that were borne out of a January 6 warrant, and the court dismissed the charges. In each of these cases, the contraband in question was discovered after the events of January 6. *See United States v. Brown*, No. 21-CR-348-SPF (M.D. Fla. Mar. 25, 2025), dkt. #376 (government taking the position that "Presidential Proclamation requires the Department to seek dismissal of the indictment with prejudice" where indictment charged unlawful possession of firearms and explosives that were seized through a January 6 warrant); *United States v. Reffitt*, No. 22-CR-289-SDJ-BD (E.D. Tex. Feb. 28, 2025), dkt. #47 (government moving to dismiss indictment charging unlawful possession of a silencer with prejudice pursuant to Executive Order); *United States v. Sattler*, No. 23-CR-438-JRR (D. Md. Feb. 26, 2025), dkt. #38 (government moving to dismiss with prejudice indictment charging unlawful possession of firearms seized from a January 6 warrant after DOJ "concluded that President Donald J. Trump *pardoned Mr. Sattler of the offenses in the indictment*." (emphasis added)); *United States v. Ball*, No. 24-CR-97-TPB-PRL (M.D. Fla. Feb. 20, 2025), dkt. #42 (government moving to dismiss indictment charging unlawful possession of a firearm with prejudice pursuant to Executive Order); *see also United States v. Bertino*, No. 22-CR-329-TJK (D.D.C. Mar. 27, 2025), dkt. #20 (government moving to dismiss with prejudice information charging seditious conspiracy and unlawful possession of a firearm seized through a January 6

10

warrant).

In three cases known to undersigned counsel, courts did not grant dismissal of derivative cases based on the January 6 pardon, but nonetheless, the government has remained consistent in its position that the pardon requires dismissal. These cases are unique insofar as the courts are acting in defiance of the Presidential pardon, yet the premise the government seeks dismissal under is the same – the crimes or contraband were discovered after January 6, but based upon a January 6 derived warrant. *See, e.g.*, *United States v. Wilson*, No. 25-3041 (D.C. Circuit May 29, 2025) (government requesting appointment of amicus curiae to defend district court order where "government did not oppose Wilson's § 2255 motion because, in its view, the Presidential pardon covers a broad range of conduct related to the events of January 6," including unlawful possession of firearms seized through a January 6 warrant), *appeal pending*; *United States v. Costianes*, No. 21-CR-458-JKB (D.Md. May 9, 2025), dkt. #182 (after court rejected that pardon applies to derivative prosecutions, government filed supplemental memorandum in support of motion to dismiss stating "the Department has determined that its resources should not be devoted to investigating and prosecuting certain in-home offenses (like Mr. Constianes's) that would not have been discovered if the government had not investigated and prosecuted people for their conduct related to the events at or near the United States Capitol on January 6, 2021," and then court dismissed indictment); *United States v. Martin*, No. 24-7203 (9th Cir. Mar. 13, 2025), dkt. #25 (government moving to vacate judgment and remand for dismissal of indictment charging unlawful possession of firearm seized through January 6 warrant, arguing the seizure was "related to" the events of January 6), *appeal pending*.

The government has opposed dismissal in only a handful of cases, most of which did not stem from a January 6 warrant, but instead, from independent sources. *See, e.g.*, *United States v.*

*Taranto*, No. 23-CR-229-CJN (D.D.C. May 6, 2025), dkt. #122 (government opposing reconsideration of denial of defendant's motion to dismiss, stating, "In the cases cited by defendant (Mot. 7), the evidence was discovered during the execution of search warrants issued in connection with the January 6, 2021, investigations. By contrast, law enforcement agents searched Taranto's van and backpack in June 2023 because he suggested that he had equipped his vehicle with a detonator and they were concerned that it contained a dangerous explosive device. That is when they found Taranto's firearms. The exigency of the situation on June 29, 2023, justified the searches—they were not executed pursuant to a search warrant for evidence of January 6 offenses. Subsequent search warrants sought evidence for all of Taranto's conduct and were not limited to what he did at the U.S. Capitol on January 6, 2021."); *United States v. Kelley*, No. 22-CR-118-TAV-JEM (E.D. Ten. Feb. 18, 2025), dkt. #95 (government opposing vacatur of jury verdict and dismissal of indictment where defendant was found guilty of threatening, soliciting, and conspiring to murder federal law enforcement officers who arrested him on January 6; case did not stem from a January 6 warrant, but instead, from a cooperator); *see also Costianes*, No. 21-CR-458-JKB (D.Md. May 9, 2025), dkt. #175, at 8-9 (government stating defendant's separate offenses in *Kelle*y "were discovered through means unrelated to any investigation into his actions on January 6," and distinguishing *Taranto* because the defendant "broadcast some of his June 2023 offenses live over a public YouTube channel and that law enforcement discovered his other offenses when he was apprehended after a confrontation with U.S. Secret Service agents.").

The government has also opposed dismissal in cases involving analogous charges, but while expressly pointing out that the evidence did not arise solely from a January 6 warrant. *See United States v. Daniel*, No. 24-CR-209-FDW (W.D.N.C. Apr. 16, 2025), dkt. #32 (government opposition noting preexisting investigation into child sex offenses as of February 2021; January 6

search warrant was executed on November 30, 2023; government stating, "Defendant mischaracterizes the evidence in the child exploitation investigation by claiming that *all* of the evidence supporting the WDNC indictment was derived from the WDNC Search Warrant related to January 6, when in reality, both MHPD and FCSO had already taken substantial independent steps in investigating those crimes, including interviews and device extractions. even without the WDNC Search Warrant related to January 6, there was sufficient probable cause to search for, seize, and review the contents of Defendant's electronic devices for evidence of child exploitation crimes based on the pre-existing evidence from the MHPD and FCSO investigations. Defendant's child-exploitation offenses are thus not "related to" the conduct on January 6, 2021, for which he was pardoned."); *but see United States v. Colton*, No. 24-CR-29-DAD (E.D. Ca. June 16, 2025), dkt. #55 (government opposing dismissal where child pornography evidence was discovered in plain view when executing a January 6 warrant at the defendant's home).

Aside from *Colton*, which is pending a decision by the district court, all of these cases show that the government itself has interpreted the Executive Order to encompass charges stemming from a January 6 investigation. The evidence against Mr. Tocci, present exclusively within the bounds of his home, would not have been discovered absent the January 6 warrant; because the warrant was "related to" that investigation, any fruits of the search were improperly obtained and cannot form the basis of a lawful prosecution. For support in his position, Mr. Tocci need not go any further than the government's own words in interpreting the Executive Order. *See Costianes*, No. 21-CR-458-JKB (D.Md. May 9, 2025), dkt. #175, at 6 ("the proclamation's remedial purpose will not be achieved if people subjected to January 6-related investigations continue to be prosecuted for certain in-home offenses that would not have been discovered but for those investigations.").

Principles of due process and equal administration of the law require dismissal. Certainly, the law allows the executive branch discretion in choosing who to prosecute and for what crimes. But our legal system also requires notice, foreseeability, lenity, and fair warning. *Cf. Oyler v. Boles*, 368 U.S. 448, 456 (1962) (confirming that while "the conscious exercise of some selectivity in enforcement is not itself a federal constitutional violation," a violation may arise if it is shown that "the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification."); *United States v. Ryan*, 619 F. Supp. 3d 581, 590 (E.D. La. 2022) ("The government generally enjoys broad discretion in determining whom it will prosecute. That discretion, however, is constrained by the equal-protection component of the Fifth Amendment's Due Process Clause.").

The courts play a crucial role in holding the executive branch to those due process standards. If the issue were merely a matter of prosecutorial discretion, federal courts would not be directing the government to file briefing concerning the inconsistent positions it has taken with respect to the pardon's scope and would not be declining to dismiss cases even where the government has agreed to dismissal.

The Court should promote uniform application of the law by applying the same logic the government and courts have applied in other derivative cases resulting in dismissal. The government should not be permitted to conclude in one derivative case that the Executive Order applies and not apply the same logic to another case stemming from the same investigation and bearing the same connection to the pardon. The pardon makes no distinction between a derivative firearms case and a case such as this one. The scope and ramifications of the Executive Order should not be construed more narrowly for Mr. Tocci than they have been for other similarly situated defendants by other district courts.

14

**B. In the alternative, the evidence forming the basis of the charge against Mr. Tocci must be suppressed because it resulted from an unreasonable search.**

If the Court determines that the pardon does not apply to the instant case, it should alternatively suppress the evidence as the fruit of an unreasonable search. The search was unreasonable because it was the product of an investigation that was unjust and should never have taken place. *See* Exhibit D. The government's position regarding the search of Mr. Tocci's residence is inconsistent with its position on January 6 warrants in other cases. Here, it has taken what amounts to a results-oriented approach to search and seizure, essentially arguing that because the warrant in Mr. Tocci's case resulted in the seizure of child pornography, the search was lawful. But in firearms cases, it is arguing, and has argued successfully, that nearly identical warrants should not have issued. *See supra*, page 10. The Executive Order does not discriminate between derivative firearms cases and other cases; if a firearms case must be dismissed, then so too must a case such as this one. The Fourth Amendment prohibits unreasonable searches, regardless of what the government seizes as a result of the search. *Cf. United States v. Rodriguez-Davila*, No. 05-91-KKC, 2006 WL 782740, at \*7 (E.D. Ky. Mar. 21, 2006) ("Although Trooper McCowan's 'hunch' that motivated his continued questioning of defendant was ultimately proven correct, Fourth Amendment analysis is not 'results-oriented'.").

As an initial matter, the alleged nexus between Mr. Tocci's actions on January 6 and his electronic devices was tenuous at best. Agent Boucher made generic statements in the warrant affidavit that were not based on any facts specific to Mr. Tocci. For example, he stated that "virtually all adults in the United States use mobile digital devices" and "it is common for individuals to back up or preserve copies of digital media (such as photos and videos) across multiple devices to prevent loss." Exhibit A at ¶¶58-59. He also attested, "laptop ownership among White adults is very high," and "individuals typically keep laptops, mobile phones and tablets at

15

their residence." *Id.* at ¶62. Yes, Mr. Tocci was observed using his cell phone at the Capitol on January 6, but he was not known to have used his laptop and hard drives for his actions that day. The agent suggested that there may be evidence of Mr. Tocci's involvement on his other devices without proof that he currently owned any other devices or used them for an unlawful purpose.

Additionally, the exclusionary rule prevents "the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis v. United States*, 564 U.S. 229, 231–32 (2011). Evidence obtained during an unlawful search cannot be used as "proof against the victim of the unlawful search." *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). The agents in this case relied exclusively on the fruits of the January 6 warrants to search Mr. Tocci's home, phone, and person to obtain the probable cause for the warrant to later search his electronic devices. More specifically, but for the search of Mr. Tocci's home, agents would not have discovered the alleged child pornography on his laptop and hard drive and dock, which provided the alleged probable cause for the subsequent warrant. Therefore, all evidence obtained by the government pursuant to the warrant for the devices is derivative of the January 6 warrants. Because Mr. Tocci was pardoned for all crimes related to his activities on January 6, all fruits of the January 6 warrant must be suppressed.

The search is not excused by any exception to the exclusionary rule. For example, the plain view exception requires an officer to be lawfully present in the location where he observes evidence of a crime. *See United States v. Gamache*, 792 F.3d 194 (1st Cir. 2015) ("As we have explained, the plain view doctrine permits the warrantless seizure of an item if the officer is lawfully present in a position from which the item is clearly visible, there is probable cause to seize the item, and the officer has a lawful right of access to the item itself."). Here, the only authorization for being inside Mr. Tocci's home was the flawed January 6 warrant. Similarly, the

good faith exception applies only when an officer acting in good faith could have reasonably assumed the deficient search warrant was valid. *See generally, United States v. Sheehan*, 70 4th 36, 51-52 (1st Cir. 2023). President Trump's characterization of the January 6 investigations as a "grave national injustice that [was] perpetrated upon the American people" forecloses any good faith reliance by officers executing January 6 related search warrants. Exhibit D. Furthermore, if the good faith exception applies in this case, the government would need to explain why the government decided to dismiss the charges against other defendants based on evidence discovered by officers relying in good faith on January 6 search warrants. Applying the plain view and good faith exceptions here would be antithetical to the pardon's remedial purpose. *See id.*

## IV.   Conclusion

For the foregoing reasons, Mr. Tocci moves to dismiss the information, or in the alternative, to suppress the evidence against him.

<div style="margin-left:50%">

Respectfully submitted,

DANIEL TOCCI,

By his attorneys,

/s/ *Jessica Thrall*
Jessica Thrall
B.B.O. # 670412

/s/ *Samia Hossain*
Samia Hossain
B.B.O. # 696329

Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
(617) 223-8061
jessica_thrall@fd.org
samia_hossain@fd.org

</div>

Date: July 1, 2025

17

**<u>CERTIFICATE OF SERVICE</u>**

I, Samia Hossain, hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on July 1, 2025.

<div align="center">

*/s/ Samia Hossain*
Samia Hossain

</div>